UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

| | |
|---|---|
| ANTHONY W. BESTHOFF, Jr., derivatively and on behalf of WORLD WATER WORKS HOLDINGS , INC.<br><br>Plaintiff,<br><br>v.<br><br>PRASHANT MITTA, RAVI REDDY, RAVISHANKAR TUMULURI, and WORLD WATER WORKS HOLDINGS, INC.<br><br>Defendants. | Civil Action No _____<br><br><br>**VERIFIED SHAREHOLDER COMPLAINT AND JURY DEMAND**<br><br><br>**Document Filed Electronically** |

Plaintiff Anthony W. Besthoff, Jr., a shareholder of World Water Works Holdings, Inc. ("WWW" or the "Company"), by his attorneys WHIPPLE AZZARELLO, LLC, makes the following Verified Complaint pursuant to Fed. R. Civ. P. 23.1 on behalf of World Water Works Holdings, Inc.:

## SUMMARY OF ACTION

1.   This is a stockholder derivative action brought by Anthony W. Besthoff, Jr. on behalf of nominal defendant WWW against members of the Company's Board of Directors ("the Board") for breaches of fiduciary duty and gross mismanagement in connection with the various transactions between WWW and its Indian counterpart (the "India Operations"), which are now wholly-owned by the same individuals sitting on Holdings' Board.   The India Operations are a former wholly-owned subsidiary of WWW that were spun-off as an independent company, owned

1

by entities controlled by members of the WWW Board.  Through their dual roles as members of the US-based WWW Board and as owners of the India Operations, defendants Prashant Mitta, Ravi Reddy and Ravishankar Tumuluri    (the "Conflicted Board Members") have taken over WWW operations to its detriment and for the sole benefit of the India Operations.

2.    WWW is a US-based company, employing over 80 individuals at its operations center in Oklahoma.  A pioneering innovator of wastewater treatment solutions, WWW develops and manufactures proprietary cutting-edge technologies, including wastewater tanks capable of "cleaning" over 14 million gallons of water a day.  Companies make large capital investments in WWW products and technologies in order to comply with regulations and save money on costs related to treating their wastewater, thereby saving money and conserving natural resources. WWW is constantly developing new technologies to enable their customers to treat wastewater more effectively and more efficiently, which developments constitute WWW's constantly changing intellectual property.  As WWW develops newer, more efficient technologies, its previous generations of technology become obsolete.

3.    WWW also partners with other entities to further develop, market, and sell wastewater treatment technologies.  Beginning in 2010 (before the Conflicted Board Members were on the WWW Board), WWW developed and built a relationship with a water and sewage authority that is one of the world's largest advanced municipal wastewater treatment providers (the "Authority"). The Authority became a WWW customer in or around 2010, when WWW sold the Authority a specific technology used in wastewater treatment.  In addition to purchasing technologies, the Authority has developed its own wastewater treatment intellectual property, but requires commercial partners to market and sell that intellectual property to other governments and

2

companies. In 2015, WWW was the winning bidder of exclusive global rights to market and sell a specific Authority technology for the life of the Authority's water patent, which could result in profits to WWW of over half a billion dollars. Currently, the Conflicted Board Members are interfering with WWW's global rights by negotiating separately with the Authority for rights to market the very same Authority technology that would inure solely to the benefit of the India Operations, and would be severely detrimental to WWW's ability to sell and market its global rights to that same technology. In other words, instead of the India Operations being required to obtain licensing rights to the Authority's technology through WWW, the Conflicted Board Members are negotiating to obtain for the India Operations separate rights to that very same technology as well as other Authority technologies. In so doing, the Conflicted Board Members have improperly put the India Operations in direct competition with the Company.

4.   As part of the transactions that spun-off the India Operations into its own independent entity, the Conflicted Board Members caused the Company to enter into a series of agreements with the India Operations (also controlled by the Conflicted Board Members). None of these agreements were arms-length transactions. Indeed, they were the result of self-dealing by the Conflicted Board Members, who improperly represented both sides of the transactions. These agreements include a Membership Interest Purchase Agreement, a License Agreement, an Intercompany Services Agreement, and a Side Letter with the India Operations. At the time the transactions were completed, WWW did not have the benefit of neutral, unconflicted leadership or guidance from independent outside counsel. Indeed, because of the blatant conflicts of interest, the Conflicted Board Members should have (but did not) recuse themselves from decisions related to the aforementioned transactions.

3

5.    The Conflicted Board Members are further permitting the India Operations to violate agreements with WWW and are not taking any actions to enforce WWW's rights pursuant to these agreements. For example, when the India Operations were spun-off from WWW, a license agreement was executed to permit the India Operations to use WWW's intellectual property and technology to develop business in the India Operations' territory. In exchange, the India Operations are obligated to pay royalties to WWW. The Conflicted Board Members are allowing the India Operations to violate the license agreement by expanding the India Operations territory, failing to demand that the India Operations pay WWW sums owed by the license agreement, and permitting the India Operations to engage in contracts which violate the license agreement. In short, business decisions being made by Conflicted Board Members are being made in the best interests of the India Operations, not WWW.

6.    Currently, the Conflicted Board Members are attempting to consummate a transaction between the India Operations and WWW to make WWW a minority owner of the India Operations. That transaction is designed to serve only the interests of the India Operations to the detriment of WWW. The goal of this transaction is apparently to ensure that the India Operations have an "inside track" to WWW's proprietary intellectual property and have the most advantageous license and royalty agreements. In exchange, the Conflicted Board Members propose to have WWW assume liability for capitalization costs approaching $1,000,000.00 that the India Operations have already incurred. Moreover, the Conflicted Board Members have failed to produce a scintilla of proof that the India Operations in fact incurred $1,000,000 in capitalization costs. If this transaction is consummated, WWW will have taken on significant debt and become a part owner of an operation that operated at a loss for each of the past three years, has not yet been profitable

4

and has no realistic chance of becoming so for many years. Thus, the transaction is not in WWW's best interest and is only being considered because of the Conflicted Board Members' irreconcilable conflict of interest.

7. In short, there is no legitimate way for the Conflicted Board Members to make decisions in WWW's best interest, as necessitated by their fiduciary duties, when their personal financial interests are inextricably tied to the India Operations.

8. On November 15, 2016, Plaintiff sent a formal demand to the Board (Exhibit A) that it take action to remedy the actions of members of the Board which have damaged and continue to damage the Company. Among the demands made was that the India Operations pay WWW the $790,000.00 plus interest owed in exchange for the India Operations spinning off into its own independent entity. That payment still has not been made. While the Board referred the matter to outside counsel for an independent investigation approximately two months ago, that investigation has not prevented the Conflicted Board Members from continuing to move forward with consummating the transaction to make WWW a minority owner of India Operations. Nor has the independent investigation caused the India Operations to pay the $790,000.00 due and owing to WWW. The Board has therefore clearly refused to comply with the demands made in Plaintiff's letter, and any further demand would be futile.

**PARTIES**

9. WWW is a closely held corporation incorporated in Delaware with a principal place of business in Oklahoma. WWW is the owner of World Water Works, Inc. ("WWW Inc."), the operating arm of the Company (WWW and WWW, Inc. are referred to collectively as "WWW" or the "Company").

5

10. Plaintiff Anthony W. Besthoff, Jr. is a shareholder of WWW and has been during the relevant time periods set forth in this Complaint. He is a resident of the State of Massachusetts.

11. Defendant Prashant Mitta ("Mitta") is the Chief Financial Officer of WWW and a member of the Board. He is a resident of the State of New Jersey. He has repeatedly failed to protect the Company's interests by, *inter alia*, breaching his fiduciary duties including his duty of loyalty to the Company, engaging in self-dealing, and wasting corporate assets. Mitta is also an owner and the managing member of the India Operations through various entities he owns and/or controls.

12. Defendant Ravi Reddy ("Reddy") is a member of the Board. He is a resident of the State of New Jersey. He has repeatedly failed to protect the Company's interests by, *inter alia*, breaching his fiduciary duties including his duty of loyalty to the Company, engaging in self-dealing, and wasting corporate assets. Reddy is also an owner of the India Operations through various entities he owns and/or controls.

13. Defendant Ravishankar Tumuluri ("Tumuluri") is a member of the Board. He is resident of the United Kingdom. He has repeatedly failed to protect the Company's interests by, *inter alia*, breaching his fiduciary duties including his duty of loyalty to the Company, engaging in self-dealing, and wasting corporate assets. Tumuluri is also an owner of the India Operations through various entities he owns and/or controls. (Mitta, Reddy and Tumuluri are alternatively referred to collectively as "Defendants").

14. This derivative shareholder action is being brought following a formal demand by Plaintiff to the Board that it address, remedy, and rectify the Defendants' breaches of fiduciary duty and self-dealing which has damaged and continues to damage the Company.

## DUTIES OF THE COMPANY'S BOARD AND DIRECTORS

15. By reason of their positions and ability to control the business and corporate affairs of the Company, the Defendants owe the Company and its shareholders fiduciary obligations of loyalty, good faith and fair dealing, trust, fidelity, and due care. The Defendants are required to use their utmost ability to manage and control the Company in a fair, just, and equitable manner and to act in furtherance of the best interests of the Company and its shareholders.

16. Defendants obligations include a duty to investigate, conduct due diligence, and maximize the Company's value with respect to any corporate/business venture and to refrain from taking any actions which damage or reduce the Company's value. Defendants have a duty to take advantage of business opportunities that benefit the Company.

17. To discharge their fiduciary duties to the Company, Defendants are also required to govern the Company to utilize its resources in a manner benefitting the Company and its shareholders, and not in favor of their own personal and financial interests.

18. Defendants are also obligated to act in the best interests of the Company, and to in good faith oversee, direct, and supervise the Company's business and corporate interests.

19. Defendants therefore owe the Company and its shareholders obligations of candor, fidelity, and loyalty, and are further required to not make any attempts to frustrate or impede maximization of Company and shareholder value for their own personal or financial gain.

20. Each Defendant is sued individually and in his respective capacity as an officer/director or Board member because each undertook actions which advanced their own personal and financial interests at the expense of the Company and its shareholders.

7

**JURISDICTION AND VENUE**

21. This Court has jurisdiction over the within action pursuant to 28 U.S.C. § 1332(a)(2) because plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

22. The Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business and maintains operations in this District, or is an individual who has sufficient minimum contacts such that the exercise of jurisdiction comports with traditional notions of fair play and substantial justice.

23. Venue is proper in this District pursuant to 28 U.S.C. §1391(a) because (i) one or more of the defendants either resides in or maintains operations in this District; or (ii) a substantial portion of the transactions and wrongs complained of herein, including defendants' primary participation in the wrongs detailed herein, occurred in this district.

24. This action is not a collusive one to confer jurisdiction that this Court would not otherwise have.

**BACKGROUND FACTS COMMON TO ALL COUNTS**

25. WWW was incorporated in Delaware on September 20, 2011 and thereafter acquired WWW Inc., a New York corporation incorporated on December 22, 1998 with a principal place of business in Oklahoma.

26. Mark Fosshage is the original founder, President, Secretary, CEO and Board Member of WWW and served as its CEO since its formation until he was summarily removed from that position in November, 2016.

27. WWW Inc. was created to bring innovation to wastewater treatment and to make it less costly to treat dirty water, recover resources, and reuse water.

28. WWW Inc. was created with a vision toward driving water treatment to become a profit center while remaining environmentally friendly, making a difference both economically and socially.

29. WWW Inc. employs approximately 80 people, and prides itself on a company philosophy that is family-oriented.

30. In addition to WWW Inc., the Company also acquired WWW Real Estate, LLC, which owns the Company's business operations center in Oklahoma.

The Conflicted Board Members Gain Control of the WWW Board.

31. Defendant Mitta became a preferred shareholder and officer of the Company due to his investment, through an entity called Mitta Water Holdings, LLC, in WWW. In September, 2011 Mitta became CFO of the Company.

32. Both Mark Fosshage and his father, James Fosshage, also became preferred shareholders in the Company; Mark based on his role as CEO and James based on his previous investments in WWW Inc.

33. As referenced herein, the "Think Companies" are three separate entities all owned and managed by the Conflicted Board Members, all with defendant Mitta as the designated manager.

34. Defendants Reddy and Tumuluri made investments, through the Think Companies, in the Company. Reddy and Tumuluri became shareholders in the Company due to these investments.

35. Therefore, by November 15, 2012, defendants Mitta, Reddy and Tumuluri, the owners of the Think Companies, had secured three seats on the 5-member WWW Board. Mark Fosshage and James Fosshage retained the other two seats.

36. Mark Fosshage's Board seat was dependent on his role as CEO, from which he was summarily removed in November, 2016.

The India Operations are Formed.

37. In or around 2012, Defendants Mitta, Reddy, and Tumuluri directed the formation of WWW India PVT Ltd. with the purpose of developing the Company's business in India and the Middle East.

38. Defendants Mitta, Reddy, and Tumuluri all have personal, financial, and business goals in India and used the development of the Company's business in India as a way to further these goals.

39. In or around 2015, the Conflicted Board Members formed WWW Holdings India LLC as a fully owned subsidiary of the Company and the owner of WWWI PVT Ltd. (WWWH India LLC and WWWI PVT Ltd. are referred to collectively as the "India Operations")

40. The success of the India Operations depended and depends on the technology, engineering, and methods developed by the Company. Without the Company's technology, engineering, personnel, and methods, the India Operations would be forced to expend significant capital on start-up costs and would not be viable.

41. In or around July, 2015, Defendant Mitta named himself CEO of the India Operations.

42. The development of the India Operations began to directly conflict with the proper management of the Company, as the Company's resources, technologies, and finances were being

10

increasingly redirected to the India Operations, tying up necessary capital needed for the Company's operations.

43.  Approximately $500,000.00 per year over four years (for a total of approximately $2,000,000) was spent developing the India Operations, which to date have not been profitable. The India Operations therefore constituted a drain on the US-based Company with no attendant, realizable benefit.

44.  The tension created between the now-competing organizations (i.e. investing in growth in the U.S.-based Company or diverting resources to the India Operations) led to discussions among the Board in and around late 2014 regarding the possibility of spinning off the India Operations into a separate entity apart from the Company.

45.  The India Operations were also seeking additional cash infusions which would have further diluted the Company's shareholders.   The Company's corporate structure would have allowed minority shareholders, including Plaintiff, to block any capital infusion into the India Operations that would have further diluted the minority shares.  Therefore, the Conflicted Board Members were unable to infuse the India Operations with additional cash while the India Operations functioned as a wholly-owned subsidiary of the Company.  The Conflicted Board Members therefore began planning a spin-off whereby the India Operations would exist as a separate, independent company.

The Company Contemplates a Purchase Offer.

46.  In or around the first half of 2015, the Company was also entertaining a purchase offer from Armstrong (a code name for the actual company), an international wastewater treatment company (the "Armstrong Transaction").

11

47.  The Armstrong Transaction contemplated a sale of the outstanding Company stock held by existing shareholders to Armstrong.  A $28,000,000.00 valuation of the Company was contemplated, whereby a larger portion of Armstrong' initial $14,000,000.00 investment would be paid directly to the Think Companies, requiring other shareholders to waive their tag-along rights. Payment of the remaining $14,000,000.00 would be tied to the Company's performance over five years.  The Conflicted Board Members also negotiated an agreement with Armstrong that they would purchase the India Operations back from Armstrong in exchange for $1,000,000 upon closing of the deal.  In other words, if the Armstrong deal was consummated, the Conflicted Board Members would receive an upfront payment of approximately $8,500,000 as well as full ownership and control of the India Operations.

48.  The Conflicted Board Members therefore began negotiating both the spin-off of the India Operations and the potential sale of the Company to benefit themselves (and the India Operations) first, and the Company second.  The Conflicted Board Members also structured the spin-off so that they would be the primary beneficiaries of any sale to Armstrong, with the Company benefitting secondarily (and only then based on Company performance).

49.  The Conflicted Board Members also determined their "purchase" price of the India Operations to be contingent on whether the Armstrong Transaction was consummated.  That contingency was set forth in the documents effectuating the spin-off of the India Operations.

The Conflicted Board Members Negotiate a Transaction to Spin-Off the India Operations.

50.  In July, 2015, the Company executed a series of documents to spin the India Operations off into a separate entity wholly owned by the Think Companies, which were controlled by the Conflicted Board Members—the same individuals sitting on the Company Board.  In negotiating,

12

formalizing, and consummating this spin-off transaction, the Conflicted Board Members improperly sat on both sides of the negotiating table.

51. The Conflicted Board Members drafted and directed the execution of a Membership Interest Purchase Agreement and other documents to effectuate the spin-off of the India Operations.

52. Despite the apparent and unavoidable conflict inherent in the Conflicted Board Members negotiating and controlling both sides of the spin-off transaction, no independent counsel, valuations, or projections were sought to advise the Company on benefits and/or detriments of the spin-off transaction.

53. Ultimately, the Company agreed to spin-off the India Operations for whatever price the Conflicted Board Members—and eventual owners of the India Operations—determined to be appropriate, without affording the Company the benefit of projections, valuations, or other independent counsel or advice.

54. A series of documents were executed to consummate the spin-off, including a License Agreement whereby the India Operations would be permitted to use the Company's valuable proprietary intellectual property including, *inter alia*, proprietary products, processes, trade secrets, and inventions.

55. Pursuant to the License Agreement, the India Operations were granted an exclusive, sub licensable, royalty-bearing, irrevocable license to use certain of the Company's covered intellectual property in India and other designated territories (the "PABAME Territory").

56. The intellectual property covered by the License Agreement specifically excluded "any and all improvements, additions, or modifications made to the" intellectual property by the

Licensors after the effective date of the membership agreement. In other words, the India Operations were not entitled to use any new technologies developed by the Company after the date of the License Agreement.

57. The initial term of the License Agreement was thirty (30) months, terminable upon specified conditions. Therefore, the License Agreement was limited to the use of the current technology and, in no event, beyond thirty (30) months.

58. The Company and the India Operations also entered into an Intercompany Services Agreement which governed the terms and conditions under which the Company would provide business support services, including marketing, sales and technical support, email system collaboration, and contract manufacturing services, to the India Operations.

59. Both the License Agreement and the Intercompany Services Agreement were signed by Prashant Mitta as Chief Executive Officer of the India Operations even though at that time he was also the CFO and Board Member of the Company, the other party to the agreements.

60. The Conflicted Board Members also caused the Company to sign a Membership Interest Purchase Agreement with the Think Companies (the "Membership Interest Purchase Agreement") whereby Think Water agreed to buy all of the interest in the India Operations. The consideration amount was $910,000.00 ($120,000.00 in cash and a promissory note of $790.000.00) if the Armstrong Transaction was not consummated by a specified date; if the Armstrong Transaction was consummated by that specified date the consideration amount increased to $1,120,000.00 ($120,000.00 in cash and a buy-back of Company shares).

61.  The Armstrong Transaction was never consummated and, therefore, the India Operations paid the Company $120,000.00 and issued a promissory note for $790.000.00 to effectuate the spin-off.  The promissory note became due and owing in July, 2016.

62.  Pursuant to the Membership Interest Purchase Agreement, as of the Closing of the Membership Purchase Agreement defendant Mitta's w responsibilities as Chief Financial Officer of WWW would be limited to certain enumerated tasks.

63.  According to the Membership Interest Purchase Agreement, as of the date of the closing defendant Mitta "shall not be involved or have responsibility for the day-to-day financial operations of WWW (Inc.) or the oversight over the personnel of WWW (Inc.'s) finance department."

The Conflicted Board Members Grant Themselves a Side Letter "Option."

64.  Contemporaneous with the execution of the Membership Interest Purchase Agreement, the Conflicted Board Members also caused the Company to enter into a side letter (the "Side Letter").  In that Side Letter, the Company granted an option (the "Option"), unilaterally exercisable only by the India Operations (controlled by the Conflicted Board Members), that committed the Company to buy back a 25% interest in the India Operations.  Because the India Operations were not-profitable and burning through cash, this unilateral buy-back option effectively gave the India Operations the right to require the Company to pay for 25% of its capital requirements going forward if the option was exercised.  In other words, the option served as a heads-I-win/tails-you-lose insurance policy for the India Operations – if those operations became profitable India Operations would not exercise the option, so it would not have to share the wealth, but if the operations continued to hemorrhage money India Operations could exercise the option

15

and require the Company to shoulder 25% of the Indian Operations' financial burden.  Obviously, such an arrangement was not in the best interest of the Company and never would have been agreed to by an independent, conflict free Board.

65.  Therefore, even though the Membership Interest Purchase Agreement effectuated a complete spin-off of the India Operations into a separate, independent entity, the Conflicted Board Members structured the deal so that they could come back in under the Company umbrella if it was decided—unilaterally, by the India Operations—that such a move was in the India Operation's best interest.

66.  The Side Letter granted the India Operations the option to expand their territory under the License Agreement to include all of Asia and Africa by providing written notice to the Company by January 31, 2016.

67.  By email dated January 31, 2016, defendant Mitta notified Mark Fosshage (CEO of the Company) that the Think Companies intended to exercise their Option pursuant to the Side Letter and recommended the parties "work towards formalizing the operating agreement of [the India Operations] at the earliest. Mark also mentioned that there were some protocol issues as well as some fine tuning to help WWW Inc. and WWW India arrangements work better."

68.  Among the "fine tuning" apparently required was discussions regarding structure and tax implications, class stock and board membership, minority rights, and the India Operations' rights with respect to projects outside its territories.

69.  On or about December 14, 2016, defendant Reddy, on behalf of the India Operations, wrote to the Company (of which he still serves as a Board member and director), demanding that the Company finalize the execution of the Option pursuant to specified conditions.

16

70.  Specifically, instead of the Think Companies paying the Company $790,000.00 for the spin-off of the India Operations, the Conflicted Board Members now propose that the Think Companies pay the Company only $540,00.00 due to "deduction" of $250,000.00 for the Company's "share" of $1,000,000.00 in capitalization costs (of which no proof or documentation has ever been provided).

71.  In other words, the Think Companies now allege that, while the India Operations existed as a separate, distinct, and independent company, they spent $1,000,000.00 on capitalization, and now insist that the Company be on the hook for 25% of those costs as the new 25% owner of the India Operations.  Notably, no capital call was ever issued with respect to any capitalization costs, in violation of the Amended and Restated Limited Liability Company Agreement of the India Operations which would govern the Company's ownership interest.  Moreover, the Company was given no information or notice as to what costs the Think Companies were incurring with respect to the India Operations.

72.  The India Operations have refused to make any payment to the Company, even the lesser amount of $540,000.00 they argue is all that is owed due to the deduction for capital contributions (which Plaintiff strongly disputes), and despite the fact that both shareholder James Fosshage and Plaintiff have requested that the Company demand such payment from the India Operations.

73.  The Company lacks an unconflicted, non-biased majority of the Board to respond to defendant Reddy's December 14, 2016 demand on behalf of the Think Companies and determine how the Company's interests are best served vis-à-vis the India Operations, and to demand that the Think Companies pay the Company the money it is owed (whether $790,000.00 or only $540,000.00).

The Conflicted Board Members Engage in Self-Dealing and Misuse of Company Resources.

74.  The Conflicted Board Members have repeatedly misappropriated Company resources and funds to the benefit of the India Operations, which exist as a separate company owned entirely by entities under the ownership and control of the Conflicted Board Members.

75.  Defendant Mitta has repeatedly used his Company credit card and expense account for expenses directly and solely related to the India Operations.

76.  Defendant Mitta has used his Company credit card and expense account for thousands of dollars of expenses directly and solely related to the India Operations' business, including travel to/from India and related hotel expenses and expenses related to a conference in Europe which was not attended for purposes of Company business.

77.  The Conflicted Board Members used approximately $13,000.00 in Company funds to pay a privately-retained law firm to analyze the impact of a potential buy-out on them personally (their private interest as shareholders) and have not reimbursed the Company for these expenses.

78.  In August, 2016, and October, 2016, the Conflicted Board Members directed Daniel Dair, VP of Innovation and Development of the Company, to travel to India to sell and close deals on behalf of the India Operations even though those deals have predominately been predicated on potential contracts that violate the License Agreement, and despite the fact that during both timeframes Mr. Dair was obligated to address Company business and was in fact directed to address Company business by the then-Company CEO Mark Fosshage.

79. The Conflicted Board Members similarly directed Chandler Johnson, CTO of the Company, to travel to India, Egypt and Dubai, on short notice for the same purpose—the

negotiation of potential contracts that only benefit the India Operations and violated the License Agreement.

80.  The Conflicted Board Members have repeatedly caused the India Operations to violate the License Agreement by, *inter alia*, expanding the India Operations beyond the territory prescribed by the License Agreement and providing the India Operations with proprietary Company technology not covered by the License Agreement.

81.  The Conflicted Board Members have repeatedly attempted to modify and alter the Service Agreement and License Agreement between the Company and the India Operations to unilaterally benefit the India Operations without any corresponding benefit to the Company.

82.  For example, defendant Mitta has attempted to modify the Service Agreement so that the India Operations would pay the Company well-below market rate for the services provided by the Company to the India Operations.

83.  The Conflicted Board Members have also allowed the India Operations to violate the Services Agreement which allows the Company to purchase products at cost + 20% when recent quotes provided by the India Operations exceeded cost + 30%.

84.  The Conflicted Board Members have continued to allow the India Operations to use certain of the Company's information technology, including the Company's Dropbox, Customer Relationship Management software, and email, per the Services Agreement between the Company and the India Operations.

85.  The Company Board, controlled by the Conflicted Board Members, has failed to demand that the India Operations provide the Company audited financial statements required for the Company to bill the India Operations for royalties.

86.   In an email dated November 2, 2016, defendant Mitta stated that the Company was about to become strapped for cash as soon as the first quarter of 2017 or potentially even earlier.

87.   Despite acknowledging that the Company is or is about to become "cash-strapped," the Conflicted Board Members have repeatedly failed to direct the Company to demand payment of the $790,000.00 (or at least of the $540,000.00 portion admittedly owed) still owed to it by the India Operations pursuant to the Membership Interest Purchase Agreement.

88.   In fact, Conflicted Board Members voted no on a resolution put forward by shareholder and Board member James Fosshage that, if adopted, would have required the India Operations to pay the Company the $790.000.00 which was due approximately eight (8) months ago under the Membership Interest Purchase Agreement.

89.   Moreover, the India Operations have similarly failed to pay the Company pursuant to the Services Agreement between the parties.

90.   The Conflicted Board Members have repeatedly voted on issues of Company business— or have refused to take votes on relevant issues—that relate to the India Operations or commercial agreements between the Company and the India Operations, and vote on the same pursuant to their own interests as shareholders of the India Operations over the interests of the Company.

91.   The Conflicted Board Members have voted to continue to pay defendant Mitta an annual salary $100,000.00 as "CFO" of the Company which is clearly above-market rate for the limited time and value he provides to the Company (as prescribed by the Membership Interest Purchase Agreement).

92.   The Conflicted Board Members have voted to continue to pay defendant Mitta this salary despite the fact that he is conflicted on matters of corporate governance due to his simultaneous roles as Managing Director of the Company and of the India Operations.

93.   At the direction and under the control of the Conflicted Board Members, the India Operations have bid against the Company with respect to existing customers and contracts, in violation of the License Agreement, and have engaged in contracts which violate the License Agreement.

94.   At the direction and under the control of the Conflicted Board Members, the India Operations have proposed and engaged in various contracts which violate the License Agreement.

95.   The Conflicted Board Members have taken no actions on behalf of the Company against the India Operations to protect the Company's rights under the License Agreement.

96.   The Conflicted Board Members have unilaterally changed the conditions of the Side Letter to again benefit the India Operations to the detriment of the Company.

The Conflicted Board Members Advance the Interests of the India Operations Over the Company.

97.   Defendant Mitta has also participated directly in discussions with the Authority regarding a grant of certain intellectual property to the Company.

98.   Mark Fosshage and the Company initiated the relationship with the Authority beginning in 2010 and, through a competitive bidding process, won and obtained exclusive global rights to market a specific Authority technology called "A".

99.   Those exclusive rights allow the Company to market the "A" technology for the life of the Authority's patent.  These exclusive, global marketing rights are potentially worth a half a billion dollars to the Company over the life of the patent.

100. By virtue of its agreement with the Authority, the Company would therefore be in a position to sublicense these rights to the India Operations.

101. Defendant Mitta, on behalf of the India Operations, and in a breach of his fiduciary duty to the Company, interfered with the Company's global, exclusive rights by negotiating directly with the Authority to give the India Operations separate rights to the "A" technology in violation of the Company's exclusive rights.  Mitta was able to perpetrate this interference with the Authority by holding himself out as representing the Company, despite acting on behalf of the India Operations.

102. The Company additionally was in negotiations with the Authority for exclusive rights to market other, new technologies (which similarly could have been sub-licensed to the India Operations).

103. Defendant Mitta has interfered with the Company's efforts to obtain these additional licensing rights from the Authority by again negotiating separately with the Authority for the India Operations to obtain exclusive marketing rights to these new technologies, putting the India Operations in direct competition with the Company.

104. Mitta's actions vis-à-vis the Authority are clearly aimed at furthering the India Operations because he agreed, pursuant to the Membership Interest Purchase Agreement, to have no further involvement in the day-to-day operations of the Company, so he could not have been negotiating with the Authority on the Company's behalf.

Plaintiff Makes a Formal Demand on the Board.

105. By letter dated November 15, 2016, Plaintiff raised the aforementioned concerns with the Board and requested it take immediate action to remedy the self-dealing and fiduciary violations

by the Conflicted Board Members (the "Demand Letter). A true and accurate copy of the Demand Letter is attached hereto as Exhibit A.

106. The Demand Letter requested that the Board take the requested actions and address the described issues within thirty (30) days.

107. On November 18, 2016, the Board passed a resolution denouncing the allegations set forth in the Demand Letter.

108. Shortly thereafter, the Board appointed independent counsel to investigate the demands set forth in the demand letter.

109. However, despite the passage of several months, the Board has taken no actions in response to the outside independent investigation, and no resolution of the various issues raised in the Demand Letter have been reached.

110. In fact, despite the fact that the independent investigation is ostensibly on-going, the lack of any resolution, combined with the Board's insistence on moving forward with issues such as exercise of the Option (as evidenced by Defendant Reddy's December 14, 2016 letter to the Board), implies that the Board has no desire to enact any recommendations that may result from the independent investigation, and in fact the designation of such investigation was merely a stalling tactic to permit the Conflicted Board Members to effectuate exercise of the Option before litigation is brought.

111. The Board's actions, especially viewed in light of Defendant Reddy's December 14, 2016 letter, reveal that Plaintiff's demand was in fact futile, and the so-called independent investigation was in fact a useless expedition done merely for show and delay.

## FIRST COUNT
**(Breach of Fiduciary Duty Against Defendants Mitta, Reddy, and Tumuluri)**

112. Plaintiff repeats the allegations of paragraphs 1 through 111 as if set forth in their entirety herein.

113. As directors and members of the Board of the Company, Defendants Mitta, Reddy and Tumuluri owed the Company fiduciary duties of due care and loyalty.

114. Defendants Mitta, Reddy and Tumuluri breached their fiduciary duties to the Company by repeatedly taking actions that harmed the Company to the benefit of the India Operations in which they had financial and other interests.

115. Defendants Mitta, Reddy, and Tumuluri breached their fiduciary duties to the Company by failing to recuse themselves on votes regarding Company governance when those votes conflicted with their personal and financial interests in the India Operations.

116. Defendants Mitta, Reddy, and Tumuluri breached their fiduciary duties to the Company by failing to respond to and take actions requested in the Demand Letter.

117. Defendants Mitta, Reddy, and Tumuluri's clear conflicts of interest with respect to Company matters in light of their financial and other interests in the India Operations remove all business and corporate decisions made by them from any protections of the business judgment rule.

## SECOND COUNT
**(Waste of Corporate Assets Against Defendants Mitta, Reddy, and Tumuluri)**

118. Plaintiff repeats the allegations of paragraphs 1 through 117 as if set forth in their entirety herein.

119. As a result of the misconduct and breaches of fiduciary duty described above, Defendants Mitta, Reddy and Tumuluri have wasted and squandered the Company's assets.

120. Defendants Mitta, Reddy, and Tumuluri have wasted and squandered Company assets by providing those assets to the India Operations with no corresponding benefits to the Company.

121. Defendants Mitta, Reddy, and Tumuluri have wasted corporate assets by engaging in agreements and contracts with the India Operations that are one-sided as to the benefits conferred on the India Operations with little or no corresponding benefit to the Company.

122. Defendants Mitta, Reddy, and Tumuluri have used and continue to use the Company as their personal bank to fund the India Operations, which were eventually spun-off into a separate entity for which the consideration due the Company was never paid.

### THIRD COUNT
**(Unjust Enrichment Against Defendant Mitta)**

123. Plaintiff repeats the allegations of paragraphs 1 through 122 as if set forth in their entirety herein.

124. Defendant Mitta, as a Director of the Company, voted and approved an annual salary for himself of $100,000.00 for his role as CFO.

125. Mitta's role as CFO is severely limited pursuant to the Membership Interest Purchase Agreement whereby he agreed to have no role in the day-to-day operations of the Company.

126. Mitta was personally enriched by his Company salary while he made decisions for the Company tainted and conflicted by his own interests in the India Operations.

127. Mitta used Company resources in the form of his Company credit card and expense accounts for expenditures directly and solely related to the India Operations, which expenditures thereby personally benefited Mitta.

## FOURTH COUNT
### (Tortious Interference with Contract Against Defendant Mitta)

128.    Plaintiff repeats the allegations of paragraphs 1 through 127 as if set forth in their entirety herein.

129.    In negotiating with the Authority for the same licensing rights held by the Company, defendant Mitta has tortuously interfered with the Company's rights to exclusively market and license the "A" technology.

130.    In negotiating directly with the Authority, defendant Mitta has also tortiously interfered with any prospective contracts between the Company and the Authority for licensing rights to new technologies.

WHEREFORE, Plaintiff demands judgment against the Defendants:

a). for damages in an amount to be determined at trial resulting from Defendants' breaches of fiduciary duty and corporate waste, plus fees and other costs as are equitable and just;

b). against defendant Mitta, for damages equal to his ill-gotten Company salary, and other costs as are equitable and just,

c). for equitable relief to prevent further harm to the Company, including any injunctive or declaratory relief necessary to reform the Company's corporate governance, policies, and structure;

d). for injunctive relief as follows:

1). removing the Conflicted Board Members from the Board of the Company and replacing them with non-conflicted members;

26

2). preserving the status quo during the pendency of this litigation by enjoining the Conflicted Board Members from voting on matters affecting the Company which involve or potentially involve the India Operations until a new slate of Board members are selected by unanimous consent of all shareholders;

3). ordering the resolutions passed on November 18, 2016 null and void as a result of the conflicts of interest and breaches of fiduciary duty by the Conflicted Board Members.

e). for declaratory relief terminating the India Agreement;

f). for punitive damages permitted by law; and

g). such other relief as the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues for triable.

WHIPPLE AZZARELLO, LLC

By:  John A Azzarello

*Attorneys for Plaintiff Anthony W. Besthoff, Jr. and World Water Works Holdings, Inc.*

Dated:

## **VERIFICATION**

I, Anthony W. Besthoff, Jr., under penalty of perjury, certify as follows:

I am the lead plaintiff in this action. I am a shareholder in World Water Works Holdings, Inc. and have been during the relevant time period of the actions described herein. I have reviewed the Verified Complaint and authorized its filing. Based upon my and my counsel's investigation, the contents of the Verified Complaint are true to the best of my knowledge, information, and belief.

By:_____

Anthony W. Besthoff, Jr.

Dated:  ( MAR  2017

28

# EXHIBIT A

**WHIPPLE AZZARELLO, LLC**
Attorneys at Law
_____

161 Madison Avenue, Suite 325
Morristown, New Jersey 07960
Tel: (973) 267-7300
Fax: (973) 267-0031
whippleazzarellolaw.com

**JOHN C. WHIPPLE**
Certified by the Supreme Court of
New Jersey as a Criminal Trial Attorney

**JOHN A. AZZARELLO**
Admitted in New Jersey
and New York

**AMY VALENTINE McCLELLAND**
Of Counsel

**WILLIAM J. MUNOZ**
Admitted in New Jersey
and New York

November 15, 2016

<u>Via UPS Overnight</u>

Board of Directors
World Water Works Holdings, Inc.
c/o Reitler Kailas & Rosenblatt, LLC
Attention: Edward Reitler
885 Third Avenue
New York, NY 10022

**Re: World Water Works Holdings, Inc.**

Dear Board of Directors:

I write on behalf of our client, Anthony Besthoff, Jr., a Massachusetts resident and a shareholder of World Water Works, Holdings, Inc., a Delaware corporation (the "WWW Holdings"), owner of World Water Works, Inc. ("WWW Inc."), a New York Corporation, (WWW Holdings and WWW Inc., collectively "the Company"). This is a demand that the WWW Holdings Board of Directors (the "Board") commence proceedings against Board members Prashant Mitta, Ravi Reddy, and Ravishankar Tumuluri (the "Think Designees"), who each have interests in WWW India Holdings, LLC, ("WWW India Holdings") which controls World Water Works India Pvt. Limited ("WWWI PL," collectively with WWW India Holdings, "the India Operation"). The Board must take action and retain counsel to commence litigation to remedy the Think Designees' clear self-dealing and failure to uphold their fiduciary duties to the Company, individually and collectively. We are

hopeful that the issues described herein will be addressed in full within thirty (30) days. However if the issues remain unaddressed, the Board must commence action for restitution and injunctive relief against the Think Designees for the damages presently being incurred by the Company as a result of their blatant violations of their fiduciary duties. Those violations include, but are not limited to:

    (1)    knowingly, openly and deliberately violating the terms of the current license agreements between the Company and WWWI PL with respect to technology and territory by expanding beyond the territory prescribed in the License Agreement and Services Agreement;

    (2)    failure to direct the Company to demand payment of the sum of $790,000.00 plus interest that equates to approximately $19,256.25 if paid by November 21, 2016 owed to the Company as consideration for the WWW India Holdings spin-off pursuant to the Promissory Note, or in the alternative to suspend the WWW Holdings India License and Service Agreements;

    (3)    failure to cause WWWI PL to make payment of $114,000.00 owed to the Company pursuant to the Services Agreement, or in the alternative to suspend the WWW India Holdings and WWWI PL Service Agreement, and the failure of the Think Designees to recuse themselves from any proposed Resolutions on the subject;

    (4)    failure to address commercial issues with the WWW India Holdings Operating Agreement in a manner that protects the Company's shareholder value, included but not limited to using Company resources and personnel, in direct contradiction to and contravention of direction from the Company's CEO

2

including: on October 14, 2016 sending Daniel Dair, VP of Innovation of WWW Inc. to India when he was already obligated to address WWW Inc. business during that time, on August 9, 2016 directing Dair to leave for India when he was already scheduled to be in the United States to work on an important bid, and similarly misappropriating Chandler Johnson, CTO of WWW Inc. with less than two weeks' notice. The purposes of these trips have been to sell and close deals on behalf of the India Operation, predominately predicated on potential contracts that violate the present License Agreement;

(5)     the Think Board Members' failure to recuse themselves from Board votes in which they have a clear conflict of interest, including but not limited to voting on any Resolution related to the India Operation or any commercial agreements between the Company and WWWI PL;

(6)     paying Prashant Mitta's continued salary of $100,000.00 in his capacity as CFO of WWW Holdings (1) while clearly conflicted as he simultaneously serves as Managing Director of WWW Holdings India and WWWI PL and (2) at rates that are clearly above market for the time and value he provides to the Company;

(7)     Prashant Mitta's use of approximately $20,000 of Company credit to the exclusive benefit of the India Operation, including, for example, the unapproved purchase of a $2,195.28 airline ticket for Prashant Mitta to travel from Mumbai to New York in July of 2016, and the unapproved expenses for Prashant Mitta in June of 2016 in excess of $700 at a conference in Europe, and

unapproved charges as recently as October 2016 for purchase of flights and
hotels for Ravishankar Tumuluri in excess of $1,000;

(8)    failure to evaluate all license and manufacturing alternatives at arms' length
before committing the Company to the current India Operation license;

(9)    proposing a resolution to terminate Mark Fosshage as CEO of the Company,
fully understanding the harm it may cause the Company, not for any failure to
perform his duties as CEO, but solely because he opposes Prashant Mitta's plan
to alter the Service and License Agreements between the Company and India
Operation without any additional benefits accruing to WWWH;

(10)    failure to address the violations of the Services Agreement between the
Company and India Operation that provides for the Company to purchase
products at cost plus 20%, when recent quotes provided by the India Operation
have exceeded cost plus 30%;

(11)    the Think Designees' use of approximately $13,000 in Company funds to
pay an attorney to analyze the impact of the proposed Titan Grove transaction
as it related to their private interests as shareholders without prior approval;

(12)    the Think Designees' attempt to negotiate technology and services
agreements on behalf of the India Operation directly with DC Water, a strategic
technology licensor to the Company, and DC Water's affiliates, in direct
violation of its existing exclusive technology agreement with the Company and
the Company's exclusive technology agreement with DC Water;

(13)    failure to cease the India Operation's use of certain of the Company's
information technology, including the Company's Dropbox, Customer

4

Relationship Management software (Salesforce), and email, per the Services Agreement between the Company and the India Operation;

(14)   failure to cause the India Operation to provide the Company audited financial statements for royalties billing;

(15)   misrepresenting facts to the Company's entire executive team, including the circumstances surrounding the India Operation's debt of $790,000.00 and $114,000.00 to the Company and, which the Company presently requires to sustain the business operations, and misrepresenting the Fosshage's desire to reunite the India Operation with WWW Holdings;

(16)   failing to notify Board that Prashant Mitta has solicited the Company's customers on behalf of the India Operation;

(17)   the Think Designees' attempts, on behalf of the India Operations, to outbid the Company on existing customers/partners, including ICR Ambiental, located in Mexico, and Aqwise located in Israel, both of which are outside of the India Operation territory, according to the License Agreement;

(18)   failing to inform the Board that the India Operation has engaged in contracts which violate the present License Agreement including an $80,000 project with Aqwise, an Israeli company, on July 9, 2016; and

(19)   proposing and engaging in over $50 million in potential projects outside of its licensed territory, including negotiating with Metito, a company headquartered in the United Arab Emirates, for a $2,000,000+ project in Egypt and a $3,000,000+ project in the United Arab Emirates.

5

**Damages Caused to World Water Works Holdings, Inc.**

As evidenced above, there is a sustained and undeniable pattern of self-dealing by the Think Designees. As a result of the foregoing misconduct, the enterprise value of the Company has been compromised for the direct and exclusive benefit of the Think Designees' interests in the India Operation. Further, as a direct and proximate result of the Think Designees misconduct, the morale of the employees in Oklahoma is devastated; Prashant Mitta's politicking has made the employees keenly aware of the Think Designees' campaign to retaliate against Mark Fosshage to the detriment of the Company and to the sole benefit of the India Operation.

The Company has incurred damages of approximately $20,000 due to Prashant Mitta's unauthorized use of company credit to the benefit of the India Operation.

The company has suffered damages of $13,000 due to the Think Designees' self-interested retention of an attorney to review the Titan Grove transaction.

The Company will incur $790,000 in damages if the India Operation fails to pay its debt pursuant to the spin-off promissory note.

The Company will incur $114,000 in damages if the India Operation fails to make appropriate payment under the License Agreement and Services Agreement with WWW Inc. and WWW Holdings. The India Operation's failure to pay these debts will likely lead to further damage to the Company due to its adverse impact on the Company's credit rating.

The Company will continue to incur losses due to the India Operation's continued operation outside of its agreed-upon territory.

The Company will continue to incur unnecessary detrimental costs due to its constant allocation of resources to the disproportionate benefit of the India Operation,

6

which the Think Designees control, contrary to the provisions set forth in the Services Agreement.

The Company will continue to incur costs by being forced to provide the India Operation access to technology, territory and resources at below-market prices.

The Company will incur continued losses due to the Think Designee's attempts to undercut current Company contracts with current clients.

These damages and losses, resulting from a violation of the Think Designees' duty of loyalty to the Company, are eroding the value of the Company to the detriment of non-Think-Designee shareholders.

### Shareholder Demand

Given the above, Mr. Besthoff demands that the Board take all necessary steps to investigate, address, and promptly remedy the harm inflicted upon the Company as a result of the misconduct described herein. In particular, our client demands that the Board take action regarding the blatant misconduct of Prashant Mitta. Accordingly, the Board must undertake action to stop the wrongdoing detailed herein through a committee created by the Board consisting of independent and disinterested directors, with the assistance of independent outside legal counsel. The Board Members are acutely aware of all the allegations made herein, as these issues are presently being discussed by the shareholders. Therefore, our client demands that, if the aforementioned issues and violations remain unaddressed, the Company commence legal proceedings against each party for his individual responsibility in the collective misconduct stated herein. The legal proceedings should bring claims for breaches of fiduciary duty, indemnification, and contribution among other relevant and appropriate claims. The legal proceedings

should also seek recovery of the salaries, bonuses, and other compensation paid to the parties responsible because these parties were unjustly enriched by such compensation. Additionally, the legal proceedings should seek to recover the amounts owed pursuant to the Services Agreement, the Promissory Note, and the Membership Interest Purchase Agreement, among others.

The Board must commence these legal proceedings as expeditiously as possible, keeping in mind any relevant statutes of limitations.

Finally, the Board must take all necessary actions to reform and improve its corporate governance and internal procedures to comply with all applicable laws and to protect the Company from further violations by the Think Designee Board Members of their fiduciary duties. Additionally, any future resolutions to amend or alter the Company's By-Laws or Articles of Incorporation should be put to a shareholder vote, and the following actions may be necessary to ensure proper Corporate Governance Policies:

a)      a proposal to strengthen the Board's supervision operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

b)      a provision to permit the shareholders of WWW Holdings to nominate, by unanimous consent, at least three independent candidates for election to the Board; and

c)      the dissolution or restructuring of the Governance & Remuneration Committee, which is controlled by conflicted Think Designees and to which the Board has delegated significant decision-making power.

8

**Conclusion**

In making the foregoing demands to investigate and commence litigation, our client does not concede that the Board or any member thereof is disinterested, independent, or competent to consider these demands. Three (3) out of the five (5) Board Members are Think Designees, and although they should recuse themselves from voting due to their obvious conflicts, their past behavior indicates that recusal is unlikely. Mr. Besthoff, as a shareholder, thanks you and the rest of the Board for your prompt attention to this serious matter and requests that you provide each Board Member with a copy of this letter. It is incumbent upon the Board to hold accountable all those responsible for the harm done to the Company. Should you have any requests, questions or concerns, please do not hesitate to contact me.

Very Truly Yours,

JOHN A. AZZARELLO, ESQ.
WHIPPLE AZZARELLO, LLC

9